UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SIDDIK MOHAMMAD,

               Plaintiff,

      v.

MOHAMMED HILAL BIN TARRAF,
SHEIKH MAKTOUM BIN RASHID AL-MAKTOUM,
SHEIKH MOHAMMED BIN RASHID AL-MAKTOUM,
and HILAL BIN TARRAF,

               Defendants.

DECISION AND ORDER
02-CV-282A

## **INTRODUCTION**

Currently before the Court are motions to dismiss on behalf of defendants Sheikh Maktoum Bin Rashid Al-Maktoum ("Sheikh Maktoum") and Sheikh Mohammed Bin Rashid Al-Maktoum ("Sheikh Mohammed") (collectively the "Bin Maktoum defendants")[1], and defendants Mohammed Hilal Bin Tarraf and Hilal Bin Tarraf (collectively the "Bin Tarraf defendants"). For the reasons discussed herein, the motions to dismiss are granted.

---

[1]      Until his death on January 4, 2006, Sheikh Maktoum was the Emir and Ruler of Dubai, one of the emirates comprising the United Arab Emirates ("UAE"), and the Vice President and Prime Minister of the UAE. Sheikh Maktoum died on January 4, 2006. On his death, his brother Sheikh Mohammed succeeded him as the Emir and Ruler of Dubai, and as the Vice-President and Prime Minister of the UAE. Previously, Sheikh Mohammed had been the UAE Defense Minister, as well as the Crown Prince of Dubai.

## PROCEDURAL BACKGROUND

On April 12, 2002, the plaintiff filed the instant action *pro se* against the Bin Maktoum defendants, the Bin Tarraf defendants, and the UAE, seeking $2,000,000 in compensatory damages, as well as punitive damages and other relief.  The plaintiff stated that he is a resident of Canada, and a citizen of Pakistan.  The plaintiff's claims included  "violation of international criminal law," "racial discrimination violation of international law," "cruel, inhuman, and degrading treatment," "violations of the rights to life, health and security of the person," "consistent pattern of gross violations of human rights," actual and constructive fraud, and trespass.

Plaintiff's allegations arise from a poultry farming venture in which the plaintiff allegedly was a partner, together with defendant Mohammed Hilal Bin Tarraf. Plaintiff claims that Mohammed Hilal Bin Tarraf confiscated his interest in that venture on November 26, 1995 "with the active support of Royals of Dubai."  The plaintiff alleged the following harassment:  confiscation of personal belongings; the expulsion of his children from school; deprivation of utility services for several days; "being made a hostage" at his home by a group of Royal workers for roughly two weeks, being followed by the "Royals' agents," threats of physical harm, and the refusal of UAE education officials to endorse the academic certificates of his children.  In this way, the plaintiff claims that he and his family "were tortured for three years both mentally and physically."  Attempts to obtain relief from various officials and the UAE justice system for their plight allegedly were unavailing and resulted in threats of "grave consequences including physical elimination."

The plaintiff does not allege that he or his family were physically attacked or tormented in any way.  He likewise does not allege that he was ever taken into custody or incarcerated.

On May 9, 2002, the District Court, in a decision by Hon. John T. Elfvin, dismissed the complaint *sua sponte* for lack of subject-matter jurisdiction.  The Court first held that the UAE was immune from suit under the Foreign Sovereign Immunities Act ("FSIA").  The Court dismissed all claims against the other defendants because the plaintiff failed to state a claim supporting jurisdiction under the Alien Tort Claims Act ("ATCA"), as the claims did not bear a close connection to the United States, and there was no allegation that the individual defendants acted under color of law.  All claims were dismissed with prejudice.

Plaintiff appealed, and on September 21, 2004, in a Summary Order, the Second Circuit affirmed the District Court decision, but concluded that the *pro se* plaintiff should have the opportunity to amend the complaint.  The Second Circuit held that the plaintiff had failed to state a claim under either the ATCA or its companion act, the Torture Victim's Protection Act of 1991 ("TVPA").  The Second Circuit's remand instructions were:

> Although Mohammad's complaint, on its face, ***does not allege that the TVPA was violated in contravention of the ATCA*** and the law of nations, a *pro se* litigant should typically receive at least one opportunity to amend his or her complaint . . . .  Since Mohammad might, upon amending his claims, adequately allege harms arising under the ATCA, we vacate the district court's decision and remand the case with instructions to permit the plaintiff to amend his complaint.

(emphasis added).

3

On November 1, 2004, plaintiff filed an amended complaint.  The amended complaint's  seven claims are the same as those in the initial complaint. The plaintiff merely added some introductory language to the amended complaint summarizing claims and stating the standard for TVPA, while deleting other language referring to the UAE and to his family.  He states in conclusory fashion that the Bin Tarraf defendants "have physically tortured him . . . false imprisoned him . . . [and] mentally tortured him."  He also added the allegation that "[a]s a matter of fact, Sheikh Maktoum was the main actor in torturing, humiliating and defaming the plaintiff and his directions were followed by all the defendants"  The factual allegations concerning torture, however, are identical to those in the initial complaint.

On January 3, 2005, the plaintiff requested a default, which was entered by the Clerk on January 5, 2005.  The Bin Maktoum defendants and the Bin Tarraf defendants moved to vacate the default, and this Court did so in a decision and order, dated September 26, 2005.   The plaintiff then appealed to the Second Circuit, which declined to hear the matter because there was no final order.

## DISCUSSION

### 1.   *Case Must be Dismissed under "Law of the Case" Doctrine*

The law of the case doctrine "counsels against revisiting . . . prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons . . . ." *United States v. Thorn*, 446 F.3d 378, 383 (2d Cir. 2006).  When a Court of Appeals has affirmed a district court decision, and the matter is on remand, the district court has

no ability to undo the Appellate Court's decision.  *See*, *e.g.*, *In re Ivan F. Boesky Sec. Litig.*, 957 F.2d 65, 69 (2d Cir. 1992); *Xerox Corp. v. 3Com Corp.,* 198 F. Supp. 2d 283, 292 (W.D.N.Y. 2001), *rev'd in part on other grounds*, 61 Fed. Appx. 680 (Fed. Cir. 2003).  Thus, a Court must dismiss an amended complaint where it merely pleads previously dismissed claims, and does not include any additional material facts in support of those claims.  *See Gardner v. Wansart*, 2006WL2742043 at *6 (S.D.N.Y. Sept. 26, 2006) (dismissing claims asserted in amended complaint where those claims previously pled in dismissed initial complaint and plaintiff had failed to plead further supporting facts).

Here, the Second Circuit dismissed the complaint, while remanding with instructions that the plaintiff be permitted to amend his claims of physical torture under the TVPA and ATCA.  The Second Circuit specifically held the initial complaint "does not allege that the TVPA was violated in contravention of the ATCA," and affirmed the dismissal of all other claims.  Plaintiff was only given the right to amend his complaint to allege facts constituting physical torture.

Aside from conclusory assertions in its introduction that the TVPA is applicable, the amended complaint did not modify any of operative factual allegations concerning physical torture.  The factual allegations of the amended complaint are essentially unchanged from those in the original complaint.  Because, as the Second Circuit held, the initial complaint was not legally sufficient, the virtually identical amended complaint must also be legally insufficient and therefore must be dismissed.[2]

---

[2]     Plaintiff's amended complaint must also be dismissed to the extent it is predicated on claims of "mental torture," since such claims did not survive the Second Circuit's

2.      *The Amended Complaint Fails to State a Claim of Torture under the TVPA*

Even if the facts alleged in plaintiff's amended complaint were presumed to be true, they fail to state a claim of "torture" within the meaning of the TVPA's pleading standard.  The TVPA's definition of torture is "rigorous."  *Price. v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).  Among other things, the TVPA includes a "severity requirement" that is "crucial to ensuring that the conduct prescribed by . . . the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes."  *Id*. at 92 (citation omitted).   "[T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault."  *Id*. at 93.  The term is "usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electronic currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain."  *Id*. at 92-93 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)).

Given that the TVPA represents a significant extension of the jurisdiction of the federal courts, Congress recognized that it was essential to define torture in a way consistent with the internationally recognized meaning of the term, and to provide a remedy in only extreme cases of unusually cruel abuse.  *See, e.g.*, *Price*, *supra*, 294 F.3d 82 at 92-93.  Congress did not intend to open the federal courts to any alien with a grievance.

_____

limited remand.  Plaintiff's original complaint purported to assert claims of "mental torture," but the Second Circuit stated that it had considered all of plaintiff's arguments on appeal and, with the exception of those related to his claims of physical torture, found them to be without merit.

The TVPA defines physical "torture" as follows:

> [T]he term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions) . . . is intentionally inflicted on that individual for such purposes as obtaining from that individual or third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

TVPA, Pub. L. No. 102-256, 106 Stat. 73.

Courts have dismissed TVPA complaints at the initial pleading stage even where plaintiffs have alleged extreme examples of abuse.  For example, in *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 232 (D.C. Cir. 2003), the plaintiff alleged, among other things, that Libyan authorities forcibly removed her and her husband from a cruise ship, held them captive for months, threatened them with death, and held them incommunicado with no knowledge of one another's welfare.[3] The appeals court agreed with the plaintiff that "these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators," but found that the acts were "not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the [TVPA]."  *Id*. at 234.

Similarly, in *Price v. Socialist's People's Libyan Arab Jamahiriya*, 294 F.3d 82, 86 (D.C. Cir. 2002), the plaintiffs alleged that they were incarcerated for 105 days, during which they endured deplorable conditions, "including urine-soaked mattresses, a cramped cell with substandard plumbing that they were forced to share with seven

---

[3]     The plaintiff alleged a claim for torture arising under an exception to FSIA, which utilizes the same statutory definition for torture as the TVPA.

other inmates, a lack of medical care, and inadequate food." The plaintiffs claimed that they were "kicked, clubbed and beaten" by guards and "interrogated and subjected to physical, mental and verbal abuse." *Id*. at 86. Nonetheless, the appeals court concluded that "the facts pleaded do not reasonably support a finding that the physical abuse allegedly inflicted by Libya evinced the degree of cruelty necessary to reach a level of torture." *Id*. at 94. In particular, the court emphasized that "plaintiff's complaint offers no useful details about the nature of the kicking, clubbing, and beatings that plaintiffs allegedly suffered. As a result, there is no way to determine from the present complaint the severity of plaintiffs' alleged beatings — including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out — in order to insure that they satisfied the TVPA's rigorous definition of torture." *Id.* at 93.

In *In re Agent Orange Prods. Liab. Litig.*, 373 F. Supp. 2d 7, 112 (E.D.N.Y. 2005). the district court dismissed TVPA torture claims arising out of the use of Agent Orange in Vietnam, noting, among other insufficiencies, that the plaintiffs failed to allege that they were in the defendants' custody or physical control when the alleged torture occurred. The amended complaint here suffers from the same infirmity.

The facts alleged by the plaintiff in his amended complaint do not state a cognizable claim of physical torture under the TVPA. The only new allegations are conclusory: that the Bin Tarraf defendants "have physically tortured [plaintiff] and his family members, falsely imprisoned him and his family members, defamed and humiliated him and his family members, and forced them to leave their own home

country," and that "[a]s a matter of fact, Sheikh Maktoum was the main actor in

torturing, humiliating and defaming the plaintiff and his directions was followed by all the

defendants."   Moreover, the plaintiff was never in the defendants' custody or physical

control— a necessary element of any torture claim under the TVPA.[4]

       The plaintiff also does not allege facts amounting to physical abuse.

Instead, he merely repeats that he and his family suffered various lesser indignities,

such as having their utilities shut off, their children expelled from school, their

belongings confiscated, and being forced to move and seek diplomatic refuge out of

fear of reprisals.   Those allegations do not constitute "torture" under the TVPA.   Plaintiff

continues to allege threats of "grave consequences including physical elimination," but

*Price* and *Simpson* make clear that death threats, even when coupled with incarceration

and physical abuse — both which are not present here — are not torture.   Moreover, as

in *Price*, plaintiff fails to offer useful details, such as dates, identities of the perpetrators,

and specific descriptions needed to determine if alleged abuse amounts to torture.

       In sum, the Second Circuit provided the plaintiff an opportunity to amend

the complaint to allege additional facts to support his claims of physical torture.   The

plaintiff has not done so, because the only facts he alleges fall short of the TVPA's

definition of physical torture.   At most, plaintiff has stated claims of deprivation of

properly and unfair treatment, but such claims do not constitute "torture" within the

---

[4]    The plaintiff does claim that he and his family were "made hostage by a group of Royal Workers" for an unspecified period of less than two weeks in their villa at the poultry farm.   Nevertheless, he also alleges that he "skipped from the farm to inform Pakistani Ambassador" of their plight, thus making clear that he was never actually in the defendants' physical custody or control.   In addition, the plaintiff does not allege that he or his family were physically harmed or tormented during this short period.

meaning of the TVPA.  This Court, and the Second Circuit, have already determined

that the original allegations do not support a TVPA claim.  The minor additions in the

amended complaint do not change that conclusion.  Accordingly, plaintiff's amended

complaint must be dismissed with prejudice.[5]


## **CONCLUSION**

For the reasons stated, the Court grants defendants' motions to dismiss.

The Clerk of Court shall take all steps necessary to close the case.


SO ORDERED.

s/ *Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED:  April 4, 2007

---

[5]        Defendants assert various other grounds for dismissal, including failure to file proof of service, lack of personal jurisdiction and head of state immunity.  In light of the Court's decision, however, it need not address these issues.